UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ALLEN RAY RUSSELL II,<br><br>Petitioner,<br><br>v.<br><br>TIMOTHY WENGLER,<br><br>Respondent. | Case No. C07-5506FDB-KLS<br><br>ORDER DENYING PETITIONER'S MOTION FOR DISCOVERY AND FINANCIAL ASSISTANCE |

Petitioner has filed a petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. (Dkt. #6 and #14). Although he is proceeding *pro se* in this matter, he has not been granted *in forma pauperis* status. (Dkt. #5 and #8). This matter is before the Court on petitioner's filing of a motion for discovery and financial assistance under seal. (Dkt. #18-#19). After reviewing petitioner's motion and the remaining record, the Court hereby finds and orders as follows:

Plaintiff was convicted of rape in the second degree on October 17, 2002, and sentenced to a total of 137 months in prison on November 22, 2002. (Dkt. #6, p. 2[1]). On May 4, 2004, his conviction and sentence were affirmed by the Washington State Court of Appeals, Division II. Id.; State v. Russell, 2004

---

[1] This is actually the first page of the *habeas corpus* petition form petitioner used for his petition. However, it is numbered as "Page 2" at the top of the page. For the sake of clarity and consistency, the Court will use the page numbers they appear on the petition form in its citation thereto.

WL 956531. A description of the factual and procedural history of petitioner's case provided by the court of appeals reads as follows:

> In March 2002, Russell met C.A.T., a 20-year old female, while visiting friends who lived next door to C.A.T.'s Bremerton apartment. They exchanged phone numbers, and he began calling C.A.T. several times a week. During the phone calls, they would discuss their daily lives, and he would ask her to 'go out' or 'hang out.' She would reply that' {she} would just be friends.'
> On April 24, Russell called and asked whether C.A.T. wanted to 'hang out' with him and his friends. She agreed but reiterated that she just wanted to be friends. He picked her up and they went to a friend's apartment, stopping on the way to buy malt liquor.
> When they arrived at the apartment, he, she, a man named Mike, and another man named Courtney played video games and listened to music. Then they played a drinking game for about half an hour. When the drinking game ended, they went out on the balcony and drank beer through a 'beer bong,' a device that facilitates the rapid consumption of beer. After awhile, C.A.T. went back in the apartment, sat down on the couch, and passed out for a couple of seconds or minutes.
> When C.A.T. awoke, Russell grabbed her hand and began lightly pulling her toward the bedroom. She said no, and Russell released her hand. He returned about five minutes later, grabbed her hand again, and told her to go to the bedroom. Although she again said no, he continued pulling and said that he 'needed to talk to {her}.'
> They entered the bedroom, and Russell closed the door. She sat on the edge of the bed with her feet on the floor. Russell stood in front of her and asked if he could kiss her. She said 'No.' 'I thought I told you I just wanted to be friends.' He tried to kiss her, and she pushed him away, saying, 'No. Leave me alone. I don't want to do this.' He put his hands on her shoulder, laid her down on the bed, and asked her to remove her clothes. She again said, 'No. I don't want to do this.' He unbuttoned her pants, but she re-buttoned them. He removed her shoes and asked her to arch her back so he could remove her pants. She began kicking and again said she did not 'want to do anything with {him}.' She was feeling drowsy, dizzy and nauseous, and was unable to get up.
> Russell got on top of her and began sexual intercourse that lasted for a couple of minutes. She kicked her legs a little, tried to push him off, and yelled softly for help. Finally, someone knocked on the door and told Russell he had a phone call. He got dressed and left the room.
> C.A.T. got dressed and left the bedroom. Crying and wiping her eyes, she asked Mike if she could use the phone, and he assented. She called an ex-boyfriend for a ride home but was unable to give him directions to where she was. She then called another friend, Bridget, but was again unable to give directions. Finally, she asked Mike to give directions to Eric, Bridget's husband, and Mike did.
> While she was making these calls, Russell and Courtney were outside on the balcony. They came back in, and Russell observed she was wiping her eyes. He asked what was wrong, and she replied '{n}othing.'
> Five minutes later, all four of them walked to the corner where she was to meet Bridget and Bridget's husband. On the way, Russell asked if Bridget could give him a ride too. C.A.T. said she would ask. When Bridget and Eric pulled up, however, she ran to their car, whispered to Bridget she had been raped, and got into the back seat. As the car quickly pulled away, she pointed out Russell as the man who had raped her.
> The police were called, and officers spoke with C.A.T. She then went to Harrison Hospital, where she was examined by Nurse Brinias. Brinias did a sexual assault examination, which includes the collection of forensic evidence and the taking of colposcopic pictures. She found blunt force trauma to C.A.T.'s hymen.
> After arriving at the hospital but before being examined, C.A.T. had called her mother and said she had been raped. Her mother then arranged for Russell and the

>   police to meet at a nearby convenience store, where Russell at first denied knowing C.A.T. When pressed, however, he said he had seen C.A.T. for 5 or 10 minutes earlier that evening. The police did not arrest him at that time.
>   Perhaps a half hour later, Russell called C.A.T. She answered but then handed the phone to her mother. Thinking that he was still talking to C.A.T., he asked why she was saying these things, that she knew nothing happened, and that they did not have sex.
>   The next day, Officer Knott questioned Russell. Russell now admitted a sexual encounter but alleged that C.A.T. had initiated it. He said that after she was drinking from the beer bong, she returned inside, sat on the couch, but soon went to the bathroom. When she came out of the bathroom, she called to him from the hallway, and, when he responded, whispered in his ear that she needed to speak with him in the bedroom. They went into the bedroom and began 'making out.' She asked if he had a condom, took off her clothes, and fondled his genitals. She then got on top of him, and they had sexual intercourse. When it was over, she said she had experienced two orgasms.
>   The State charged Russell with second degree rape. At trial, the State called Nurse Dacus as an expert witness. She has a master's degree in nursing and is a licensed nurse practitioner. She was familiar with scientific studies of female anatomy during sexual arousal and with the physiological changes that occur during the different stages of a woman's life. She had conducted or overseen more than 1000 non-sexual-assault examinations and more than 300 sexual assault examinations. She had never seen trauma to the hymen in a non-sexual assault examination. She believed that such trauma generally does not occur during consensual sex because of the voluntary and involuntary physical responses that generally accompany intercourse: the woman tilts her pelvis so the penis can enter without trauma, and her genitalia are lubricated. When the prosecutor asked if she had an opinion on whether Brinias's finding of trauma to C.A.T.'s hymen was 'consistent with nonconsensual sex {,}' the defense objected, saying '{no} foundation,' but the trial court overruled. Dacus then answered that she had an opinion and that the trauma to C.A.T.'s hymen 'was consistent with nonconsensual sex.' The jury convicted, the court imposed sentence for second degree rape, and this appeal followed.

Russell, 2004 WL 956531 at *1-*2 (footnotes omitted).

In his motion for discovery and financial assistance, plaintiff requests funds with which to obtain an "investigative expert" or "other services" to conduct discovery he asserts is necessary to establish his conviction was wrongful. (Dkt. #19, pp. 1-2). Specifically, he seeks medical expert testimony regarding the following two questions: (1) whether the trauma suffered by C.A.T. to her hymen instead could have been an outbreak of herpes; and (2) if a female has herpes, could she then have a herpes outbreak on her hymen. (Id. at p. 9). Petitioner asserts such discovery is necessary because evidence at his criminal trial showed that while C.A.T. had herpes while he did not, and C.A.T. testified that he was the only potential source for giving her that disease, because she had not had "sexual relations" with anyone else since her last check-up at her doctor's office. (Id. at p. 3). If he can show the trauma to C.A.T.'s hymen was due to herpes, and not non-consensual sex, petitioner argues that showing would prove his innocence.

Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts ("Rule 6")

ORDER
Page - 3

reads in relevant part as follows:

> **Rule 6.  Discovery**
>
> **(a) Leave of the Court Required.** A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery.  If necessary for effective discovery, the judge must appoint an attorney for a petitioner who qualifies to have counsel appointed under 18 U.S.C. § 3006A.
>
> **(b) Requesting Discovery.** A party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents. . . .

"A habeas petitioner, unlike the usual civil litigant in federal court," thus "is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997); see also Rector v. Johnson, 120 F.3d 551, 562 (5th Cir. 1997) (petitioner may invoke discovery processes available under Federal Rules of Civil Procedure if, and to extent that, judge in exercise of his or her discretion and for good cause shown grants leave to do so, but not otherwise).

"[T]he scope and extent of such discovery," however, "is a matter confided to the sound discretion of the District Court." Bracy, 520 U.S. at 909.  As such, "courts should not allow prisoners to use federal discovery for fishing expeditions to investigate mere speculation." Calderon v. United States District Court for the Northern District of California, 98 F.3d 1102, 1106 (9th Cir. 1996); see also Rector, 120 F.3d at 562 (Rule 6 does not sanction fishing expeditions based on petitioner's conclusory allegations). "'[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief,'" though, "'it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.'" Bracy, 520 U.S. at 908-09. (quoting Harris v. Nelson, 394 U.S. 286, 300 (1969)).

A district court abuses "its discretion in not ordering Rule 6(a) discovery when . . . 'essential' for the habeas petitioner to 'develop fully' his underlying claim." Pham v. Terhune, 400 F.3d 740, 743 (9th Cir. 2005) (citation omitted) (finding requested discovery was essential to full development of petitioner's claim, because it may have contained favorable, material information to exculpate him).  "To obtain Rule 6(a) discovery," however, it need not be demonstrated that the petitioner "will ultimately prevail on his underlying claim." Id.  Nevertheless, "[h]abeas corpus is not a general form of relief for those who seek to explore their case in search of its existence." Calderon, 98 F.3d at 1106 (citation omitted).

1   Given that the record currently before the Court, such as it is at this point, indicates the primary
2   evidence of non-consensual intercourse between petitioner and C.A.T. was the trauma C.A.T. suffered to
3   her hymen, it may be that the discovery being sought here potentially could exculpate petitioner. That is,
4   if such discovery shows that the trauma to C.A.T.'s hymen could have been caused by herpes, and if, as
5   petitioner claims, he could not have given C.A.T. that disease contrary to C.A.T.'s testimony, than it is
6   possible reasonable doubt could have been created in the minds of the jury.

7   The Court nevertheless finds that petitioner is not entitled the particular discovery he seeks at this
8   time. This is because "any right to federal discovery presupposes the presentation of an unexhausted
9   federal claim," and "a federal habeas petitioner is required to exhaust available state remedies as to each
10  of the grounds raised in the petition." Id. at 1106. In Calderon, the Ninth Circuit denied the petitioner's
11  request for discovery in part because it was "undisputed" that he had "not sought the desired discovery
12  from the . . . state court." Id. The Court of Appeals noted that since "'state court is the appropriate forum
13  for resolution of factual issues in the first instance, . . . the deferral of factfinding to later federal-court
14  proceedings'" could "'only degrade the accuracy and efficiency of judicial proceedings.'" Id. (quoting
15  Keeney v. Tamayo-Reyes, 504 U.S. 1, 9 (1992)); see also Rector, 120 F.2d at 562-63 (discovery allowed
16  only where state has not afforded petitioner full and fair evidentiary hearing).

17  Petitioner claims in his motion for discovery and financial assistance that his defense counsel did
18  not investigate whether the trauma to C.A.T.'s hymen was caused by herpes, which he asserts displayed
19  "complete ineffectiveness" and incompetence on defense counsel's part. (Dkt. #19, p. 4). Petitioner does
20  allege in the memorandum of law submitted in support of his federal *habeas corpus* petition that defense
21  counsel "was ineffective for failing to look into" the sufficiency of the source of the opinion provided by
22  the medical expert who testified at his criminal trial, and for not finding out "from another expert" if that
23  source had been tested and was correct and reliable. (Id. at p. 10). There is no indication, however, that
24  petitioner ever sought discovery on or otherwise pursued this issue in state court. Nor has he asserted or
25  shown that he asked for and was denied a full and fair evidentiary hearing at that level.

26  In his *habeas corpus* petition, petitioner states that he raised the following grounds in the direct
27  appeal of his criminal conviction:

28  *Admission of impermissible opinion testimony.
    *The court erroneously permitted a medical expert to make a legal conclusion, to

ORDER
Page - 5

testify outside of the area of her expertise.

(Dkt. #6, p. 3). Of relevance here, in its decision affirming petitioner's conviction, the Washington State Court of Appeals noted plaintiff had raised the following issues:

> . . . Did Dacus [the medical expert] violate his [petitioner's] right to fair trial by giving an opinion on guilt? Did Dacus give a legal conclusion outside the scope of her expertise? . . .[2]

Russell, 2004 WL 956531 at *3. In addressing these two issues, the court of appeals held:

> . . . Russell argues that Dacus gave an impermissible opinion on his guilt when she said that the trauma to C.A.T.'s hymen 'was consistent with nonconsensual sex.' We disagree. Dacus was saying that based on her experience and training, Brinias's findings of trauma to the hymen suggested that C.A.T. had not experienced the physiological changes that generally accompany intercourse. She was not saying that C.A.T. had been raped, or who had perpetrated the rape. She was giving a medical opinion that could well have been helpful to the jury, and her testimony was 'not a direct comment on the defendant's guilt.'
>
> Russell also argues that '{t}here was no foundation laid establishing that Ms. Dacus, a nurse practitioner testifying as a medical expert, was qualified to testify regarding the legal concept of consent or nonconsent to intercourse.' In our view, however, she was not testifying 'regarding the legal concept of consent or nonconsent to intercourse.' Instead, she was comparing the physical changes that ordinarily occur in the female body before sex with those that had (or had not) occurred in C.A.T.'s body during the incident being litigated. The prosecutor certainly asked a leading and improvident question he should have asked what C.A.T.'s exam indicated, or whether the exam showed that changes had occurred in C.A.T.'s body, not whether the exam was 'consistent with nonconsensual sex' but instead of objecting to the leading nature of the question, or to the fact that the question might blur the line between medical and legal concepts, Russell objected only to Dacus's qualifications. In light of these circumstances, we hold that Dacus's testimony was medical, not legal; that she was amply qualified to give it; and that the trial court did not err by overruling Russell's objection to 'no foundation.'

Id. There is no indication in the court of appeals' opinion, or in the record before the Court, that petitioner raised the issue of whether the trauma to C.A.T.'s hymen could have been due to herpes or whether it was ineffective on the part of defense counsel not to inquire with respect thereto, or that he requested and then was denied the opportunity to conduct further fact finding on these issues.

Petitioner also states in his *habeas corpus* petition that he filed a personal restraint petition with the Washington State Court of Appeals, Division II, on March 8, 2006, in which he raised the ground of ineffective assistance of counsel. (Dkt. #6, p. 4). Petitioner further states that petition was dismissed on January 7, 2007. (Id.). However, petitioner fails to indicate the specific reasons he gave in his personal

---

[2]Petitioner also raised a third issue of whether evidence was sufficient to support his conviction. Russell, 2004 WL 956531 at *3; (Dkt. #6, p. 3).

ORDER
Page - 6

restraint petition for raising the ineffective assistance of counsel claim. Indeed, no copies of the petition or the decisions denying it have been provided, nor has the Court's own search for those decisions found any. In addition, petitioner again has not claimed or shown that he requested discovery or an evidentiary hearing at the state level on the issues for which he is requesting discovery from this Court.

Accordingly, petitioner's motion for discovery and financial assistance therefor (Dkt. #19) hereby is DENIED. The Court notes that in the caption for that motion, petitioner has requested an evidentiary hearing. Petitioner, however, has not set forth any reasons why he believes such a hearing is necessary at this point. Nor does the Court find a determination on this issue is appropriate at this time. Finally, the Court notes petitioner has filed his motion *ex parte* under seal. The Court no longer entertains *ex parte* motions, although it may, as it is now doing and has previously done in this case, address motions and issue orders prior to service of the petition on the respondent. In addition, the Court sees no reason why petitioner's motion or other documents associated therewith filed by petitioner should be sealed. **As such, the Clerk hereby is directed to unseal those records (Dkt. #19 and #20).**

The Clerk shall send a copy of this Order to petitioner.

DATED this 3rd day of March, 2008.

*/s/ Karen L. Strombom*
Karen L. Strombom
United States Magistrate Judge